IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

APR - 8 2002

DAVID J. MALAND, CLERK
BY
DEPUTY _Jelu. Scott_

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| -vs- | § | No. 4:01-cr-89 |
| | § | (Judge Brown) |
| RICHARD JAMES TUCKER | § | |
| | § | |
| Defendant | § | |

## GOVERNMENT'S TRIAL BRIEF

TO THE HONORABLE PRESIDING UNITED STATES JUDGE FOR THE EASTERN
DISTRICT OF TEXAS:

COMES NOW the United States of America, through the undersigned Assistant United

States Attorney, and files this TRIAL BRIEF in the above entitled case.

### I. STATEMENT OF FACTS

The government will present testimony and documents that will establish the following

facts:

1.      FFAC's Business Model and History

First Fidelity Acceptance Corporation ("FFAC" or the "Company") was a Nevada

corporation that was headquartered in Plano, Texas. Formed in 1991, FFAC bought and sold car

loans, specifically retail, installment sale contracts secured by cars and light trucks ("Auto

Loans"). FFAC purchased these Auto Loans from factory-authorized automobile dealers located

throughout the United States. Typically, FFAC purchased Auto Loans made to borrowers with

poor or marginal credit history. However, each individual Auto Loan was secured by an

automobile that could be repossessed if the borrower failed to make his monthly payments.

Because the borrowers were considered high credit risks, FFAC would be able to purchase the Auto Loans for less than face value, typically a 10% to 12% discount.

After FFAC purchased a number of Auto Loans, the Auto Loans were grouped or consolidated and sold as a package of Auto Loans to financial institutions or large investors, often times in the form of asset-backed securities. By packaging the consolidated group of Auto Loans as an asset-backed security, FFAC was able to sell the loans for substantially more than it had paid for the Loans. FFAC had other sources of revenue, but these sources created minimal revenue during the period of alleged misconduct and are not material to this case. These sources included back-end fees from the purchasers and loaning money to used car dealers which would repay FFAC with interest.

The Defendant, Richard James Tucker ("Tucker"), initially joined FFAC in April 1992. Tucker was a former Arthur Andersen accountant, and had worked as President of International Assets Management, Inc. ("IAMG"), until leaving that company after the Board of Directors accused him of accounting fraud and malfeasance. Tucker was hired by FFAC as a consultant to assist with the company's first, private placement of asset-backed securities. In September 1992, the private placement was successfully completed, and Tucker was named President, Chief Executive Officer and Chairman of the Board of Directors of FFAC. Tucker served in these positions until he resigned from the Company on April 4, 1998 under allegations by the Board of Directors of accounting fraud and malfeasance.

2.      FFAC Trusts 1, 2 and 3 and the Private Placement Memorandums

By late 1995 and early 1996, FFAC's business was facing difficulties with its cash flow and liquidity. The Minutes from the FFAC Board of Director's Meeting in October 1995 record Mr. Tucker's statements that additional financing was "critical to the survival of the Company"

and his request that the Directors help him identify sources for the "desperately needed $250,000." Tellingly, FFAC did not file any audited financial statements after December 1995, even though FFAC was required to file such forms by the Securities and Exchange Commission.

In response to this cash flow problem, Tucker created a new investment structure for FFAC in January 1996. Tucker found FFAC Automobile Receivables Corp., a wholly-owned subsidiary of FFAC. Tucker, through FFAC Automobile Receivables Corp., sold "certificates" in several independent Trusts. Individual investors who bought the certificates would invest directly into the Trusts. The investors' money would be held in the Trusts and invested in Auto Loans. Investors would receive monthly interest payments at the rate of prime plus three and a quarter percent from their investment. Neither FFAC nor its subsidiaries would have access to the investors' money in the Trusts or to the Auto Loans purchased by the Trusts unless FFAC paid the Trusts the full value of the Auto Loans. Specifically, as explained in the Private Placement Memorandum ("PPM") for the first Trust :

> "[t]he proceeds (of the Trust) can only be used for the purposes indicated. At all times, the Trust will have investments and cash with an aggregate value in excess of the aggregate balance of the Certificates. . . . None of the assets of the Trust created are available to the Company or to any other subsidiaries of the Company without first paying Trust the full carrying value of such assets."

Tucker eventually created three, independent trusts and the PPMs for all three trusts contained similar statements. (The three PPMs will be introduced as Government's Exhibits No. 1, 2 and 3.) In this manner, the investment was secured by specific assets; the Trust would have collateral of either the invested money or the Auto Loans. And all assets would be held by the Trust not FFAC. In addition to the assurances in the PPMs, Tucker made similar oral representations to the brokers who were selling interests in the Trusts and to investors. Several brokers and

investors will testify that they specifically remember Tucker's statements that the Trusts' funds would only be used to purchase Auto Loans and would not be used for FFAC's operating expenses or to repay FFAC's outstanding debts and obligations.

As an additional measure to assure investors of the liquidity of their investment, the PPMs stated that investors could withdraw their full investment within a short period of time. Trust-1 and Trust-2 investors could liquidate their investment and receive their money back within 90 days of notice to the Company. Trust-3 allowed investors to receive repayment of their principal within 15 days.

Through these offerings in 1996 through March 1998, individuals invested approximately $17 million dollars in the three Trusts. During this time period, Tucker never issued any audited financial statements for FFAC or for the Trusts.

3.    Tucker's False Statements regarding Use of Investors' Money

In late 1997, FFAC was unable to honor several investors' requests for return of their principal investment. Over the next six months, brokers, investors and Directors of the Company put increasing pressure on Tucker to disclose financial statements, but Tucker refused. In March 1998, Tucker was forced out of the Company by the Board of Directors. And when outsiders examined the books and records of FFAC for the first time in three years, they determined that the Company was insolvent, that Tucker had not invested the Trust money in the manner described in the PPMs, and that there were no assets or collateral that were available to repay the investors. Instead of using the money to invest in Auto Loans, Tucker had spent the investors' money in a Ponzi scheme, repaying FFAC's past debts, paying interest and principal to prior Trust investors, and paying FFAC's operating expenses, such as salaries, rent, travel and executive entertainment. By April 1998, the Trusts had effectively no assets or cash, and

therefore Tucker was unable to repay principal or make interest payments as they came due. Unable to attract new investors, Tucker's Ponzi scheme collapsed on itself.

The government's evidence, which largely is FFAC's own internal records of deposits and disbursements, will establish that Tucker transferred investors' money immediately from the Trust to FFAC's operating account, and then immediately used that money to pay FFAC's debts, to pay interest to previous Trust investors, to pay legal settlements for which Tucker was individually liable, to pay Tucker's travel and entertainment expenses, and to pay FFAC's general operating expenses, such as executive salaries and rent.

FFAC's financial records will also shows that less than $4 million of the $17 million dollars invested in the Trusts went to purchase Auto Loans. Tucker directed an additional $4 million to companies controlled by Gail Cooper, a colleague of Tucker's. Cooper had served as a consultant to FFAC in 1995 and 1996. But when Cooper was indicted on federal charges of fraud in June 1996, the FFAC Board of Directors expressed concern about FFAC's relationship with Cooper, and Tucker falsely represented to the Board that FFAC "no longer has any dealings with Mr. Cooper and that no moneys were owed Mr. Cooper." FFAC paid Cooper and his companies millions of dollars after the time of Tucker's misrepresentation, and at the time Tucker was removed, the FFAC books indicate the FFAC had loaned Cooper approximately $980,000 that never was repaid.

Finally, FFAC's financial records will show that during the time the Trusts were in existence, Tucker was using the Trust funds - investors' moneys that were supposed to be kept separate and invested in assets - as the primary source of income. Without the money transferred from Trust, FFAC would not have been able to keep their doors open, literally.

4.    Tucker's Other False Statements

In addition to the false statements regarding the use of invested funds, Tucker made a number of other false statements in the sale of the Trust securities, both in the PPMs and in conversations with brokers and investors. As previously discussed, Tucker stated that the investors' money would be held in Trust and would not be available to FFAC. Notwithstanding these representations, the government's evidence will establish that Tucker regularly transferred investors' money directly from the Trusts' accounts to the FFAC Operating Account, and that FFAC did not first pay the Trusts the full carrying value of such assets.

Tucker also represented to investors and brokers that FFAC was not aware of any adverse lawsuits that would materially affect the Company. In direct contrast to these representations, Tucker candidly admitted to corporate counsel that certain lawsuits threatened the Company's ability to conduct business and that disclosure of the lawsuit would cause the Company to cease operations. Tucker made similar admissions in statements to the Securities and Exchange Commission and in civil lawsuits.

Finally, the government's evidence will prove that Tucker made false statements regarding the number of unaccredited investors who invested in the Trusts, and that Tucker took affirmative actions to conceal the number of unaccredited investors. Unaccredited investors are defined by securities laws as investors without a net worth of at least $1 million and who do not make an annual salary of at least $200,000. Federal securities laws limit the number of unaccredited investors that can invest in certain types of high-risk offerings. The government's evidence will establish that Tucker repeatedly told brokers only 35 unaccredited investors would be permitted to invest in each Trust, even though he knowingly sold certificates in the Trusts to several hundred unaccredited investors. The evidence will further show that Tucker knew of this

regulation limiting unaccredited investors, that he knew FFAC had violated this federal regulation, and that he took affirmative action to cover up the violation from others.

5.   Use of the United States Mails

Various FFAC employees and investors will testify that Tucker made, or caused others to make, extensive use of the United States mails and interstate carriers in executing his scheme. Tucker directed the FFAC employees to mail the PPMs and other marketing materials to brokers and other interested investors.  Then, in the PPMs, Tucker directed investors to complete the subscription application and mail the application and a check directly to FFAC in Plano, Texas. Patti Plunkett, the former FFAC chief financial officer, will testify that she received each of the applications and checks referenced in the Indictment.  Plunkett will further testify that Tucker subsequently used the United States mails to send monthly interest checks to the Trustee, Margaret Lombardo, instructing Lombardo to mail the interest payments to the investors.

## II.  ANTICIPATED PROCEDURAL ISSUES

I.   **Pursuant to Rule 404(b) Evidence, Tucker's Prior Acts Prove That Tucker's Scheme Was Conducted Knowingly, Intended and Not the Result of Mistake or Accident.**

The government's evidence will prove that Mr. Tucker has engaged in two other schemes involving corporate and accounting fraud that were substantially similar to his scheme at FFAC. By introducing evidence of the other schemes, the government will prove that Tucker knowingly and intentionally executed his scheme while at FFAC and that his false representations and use of mails were not the result of negligence or mistake.  The two other schemes were substantially similar to Tucker's actions at FFAC, and therefore each scheme can be proven up concisely and through a single witness. The government provided notice to the Defendant on December 7,

2001 in accordance with the Court's Pretrial Order, and repeated the notice in greater detail on March 15, 2002.

Specifically, Tucker executed his two schemes while he was president of two different companies. First, prior to his employment at FFAC, Tucker served as President of International Assets Management Group, Inc. ("IAMG"). Tucker also was on IAMG's Board of Directors. While Tucker worked at IAMG, he entered a lucrative employment contract in which he received substantial cash and stock bonuses if IAMG achieved certain financial targets. After entering this contract, Tucker made false representations and omissions from accounting records, making it appear that IAMG had achieved these targets. Based on the false accounting records, IAMG paid Tucker cash and stock bonuses. Subsequently, IAMG discovered that Tucker had fraudulently prepared the false and misleading financial statements. Tucker resigned from the Company and ultimately settled a lawsuit brought by IAMG. Similar to his position at FFAC, Tucker served in a leadership role at IAMG, entered a favorable employment contract based on financial goals, and then made misrepresentations regarding the company's finances to the company's Board of Directors and others in order to secure his bonuses, his salary and his continued employment.

In the second scheme, after Tucker left FFAC in 1998 under allegations of securities and accounting fraud, Tucker served as President of Global Source, Inc. While at Global Source, Tucker again raised money from individual investors by making false representations regarding the business plan. Tucker falsely represented that the Global Source business plan was progressing, and that the company would start producing profits in the short term. Investors in Global Source became suspicious of Tucker's performance and confronted him, asking Tucker to disclose the company's financial statements. Tucker refused to disclose any financial

74

information, referring the investors to a lawyer. When the investors contacted the lawyer, the lawyer stated that he had not represented Global Source for two years and thought that the investors should have access to the Global Source records. In summary, similar to his actions at FFAC, Tucker made false representations about the financial condition of the company, subsequently refused to disclose any records, and the investors lost all of their money that they had invested in Global Source.

## II.   Summary Exhibits Introduced Pursuant to Rule 1006 Will Assist Jurors Understand Voluminous Financial Records.

The government intends to introduce summaries of the FFAC financial records pursuant to Rule 1006 of the Federal Rules of Evidence. The government and defense counsel have agreed that contents of the Government Summary Exhibits will be made available to the Defendant prior to trial and the documents underlying the summary exhibits, specifically the FFAC financial records, have been made available to the defense to inspect and copy during the course of pre-trial discovery. Further, the government has notified the defense in advance of trial that it intends to introduce evidence, in summary fashion, pursuant to Rule 1006 of the Federal Rules of Evidence.

The government intends to have Government's Summary Exhibits available at trial, and will have it identified by Special Agent Dale Webb, of the Federal Bureau of Investigation.

Rule 1006 of the Federal Rules of Evidence provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

The requirements for Rule 1006 have been satisfied in this case in that (1) the underlying documents are voluminous, (2) they cannot easily be examined in court by the trier of fact, and

(3) the underlying documents have been made available to the opposing party prior to trial at reasonable times and places so that they could be inspected and/or copied.  Further, the underlying documents will be available in court.  The evidence underlying the summary exhibit or testimony need not be admitted under rule 1006.  Rather, the summary exhibit or testimony is admissible in lieu of the underlying documents and the summary itself is evidence.  *United States v. Skalicky*, 615 F.2d 1117, 1121 n.5 (5th Cir. 1980); *United States v. Clements*, 588 F.2d 1030 (5th Cir. 1979).  Under these circumstances, and due to the fact that the Government Summary Exhibits do not contain argumentative matter, the Court need not give a cautionary instruction with regard to the admission of the exhibit.  *United States v. Osum*, 943 F.2d 1394, 1405 n.9 (5th Cir. 1991).

## III. Non Exclusion From The Courtroom Of Government Agents Who Will Be Witnesses.

Special Agent Webb of the Federal Bureau of Investigation ("SA Webb") is the case agent in the investigation of the case that resulted in the instant Indictment.  The government intends to call SA Webb as a witness at trial.  The government respectfully requests that SA Webb be allowed to remain in the courtroom throughout the trial to assist and advise government counsel throughout the trial.  The Fifth Circuit has held that government agents, such as SA Webb, are an exception to Rule 615 of the Federal Rules of Evidence, even when other witnesses precede such an agent-witness.  *United States v. Auten*, 570 F.2d 1284 (5th Cir. 1978).

## IV. Tucker's Statements to Government Agents in a Non-Custodial Setting Without *Miranda* Warnings Are Admissible.

The government intends to introduce, through the testimony of SA Webb, the statements made by the Defendant to SA Webb during the course of the investigation that resulted in the instant Indictment.  The government will offer evidence of the Defendant's statements made to

SA Webb, in response to the Agent's questions, during the course of a voluntary interview on

May 14, 15 and July 15, 1998.  The defendant initiated the interview with SA Webb concerning

the facts of the case.  The defendant was not given a <u>Miranda</u> warning because the Defendant

was not in custody.  Therefore, <u>Miranda</u> warnings were not necessary for the statements to be

voluntary and admissible.

To determine whether a suspect was in custody during interrogation and entitled to

<u>Miranda</u> warnings, a four factor test must be applied:  (1) whether there was probable cause to

arrest; (2) whether the law enforcement officer had a subjective intent to hold the suspect; (3)

whether the suspect had a subjective belief that his/her freedom was significantly restricted; and,

(4) whether the focus of investigation was centered on the suspect at the time of questioning.

*United States v. Bengivenga*, 811 F.2d 853, 854-855 (5th Cir. 1987); *United States v. Alvarado*

*Garcia*, 781 F.2d 422, 425-426 (5th Cir. 1986).  However, in the absence of the first three

factors, the last factor is insufficient to render an interrogation custodial.  <u>Bengivenga</u>, 811 F.2d

at 855.

The Defendant could not have had any belief, subjective or otherwise, that his freedom

was restricted in any way.  The Defendant initiated the contact and interview and was not

responding to any subpoena or other communication from the government.  The Defendant came

by himself and left by himself.  Further, SA Webb will testify that she did not have any intention

of holding the Defendant at any time during or at the conclusion of the interview.  SA Webb

never exhibited any force or restricted Defendant's movement.  The Defendant was free to leave

at any time, and eventually did leave.  Based on the foregoing, the government submits that the

evidence will establish that the statements are admissible.

**V.     Defendant's Proposed Expert Witness Testimony Regarding the Interpretation of
the Private Placement Memorandum is Inadmissible Under Rules 702, 703 and 705.**

The defendant has indicated that he intends to present Mr. Joel Held, a civil attorney who represented Mr. Tucker before the Securities and Exchange Commission, to give expert testimony regarding reasonable interpretations of the Private Placement Memorandum. Specifically, it is anticipated that Mr. Held will testify that the Private Placement Memorandum could be reasonably interpreted so broadly as to permit Mr. Tucker's use of the investors' funds. Such testimony is improper and such not be permitted.

Under Rule 702 of the Federal Rules of Evidence, an expert witness can give an opinion if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702  The proposed testimony of the Defendant's civil lawyer is not based on any facts or methods and is not the product of a reliable principle or method; it is simply an attempt to bolster the defendant's theory of the case. Under *Daubert* and *Kuhmo Tire*, expert testimony must be based on a reliable and proven theory, subject to testing, peer review and calculation of rates of error. *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 134, 147 (1999), *citing Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579 (1993).  Mr. Held's interpretation and opinion of the Private Placement Memorandum is not based on a reliable or proven theory, is not subject to peer review, and is not of such a nature that a rate of error could be calculated.

Respectfully submitted,
MATT D. ORWIG
UNITED STATES ATTORNEY

ARNOLD A. SPENCER
Assistant United States Attorney
Texas State Bar No. 00791709
660 North Central Expressway, Suite 400
Plano, TX 75074  (972) 509-1201

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was mailed by first class mail to Mr. Billy Ravkind, attorney for the defendant, 2651 N. Harwood, Suite 250, Dallas, TX 75201 on this _____ day of _____, 2002.

Arnold A. Spencer